UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PHILIPS ORAL HEALTHCARE, INC., f/k/a OPTIVA CORPORATION,<br><br>                    Plaintiff,<br><br>          v.<br><br>FEDERAL INSURANCE COMPANY,<br><br>                    Defendant. | CASE NO. C98-1211JLR<br><br>AMENDED ORDER |

## I.  INTRODUCTION

This matter comes before the court on a motion for award of attorneys' fees and costs (Dkt. # 613) by Plaintiff Philips Oral Healthcare, Inc. ("Philips") and on a motion for an evidentiary hearing (Dkt. # 642) by Defendant Federal Insurance Company ("Federal").  Having read and considered the motions together with all the documents filed in support and opposition thereof, the court DENIES Federal's motion for an evidentiary hearing and GRANTS Philips' motion for attorneys' fees and costs but reduces the amount awarded for the reasons stated below.

## II.  BACKGROUND

After seven years of litigation, the parties and the court are familiar with the extensive procedural and factual history of this case.  As such, the court addresses only

ORDER – 1

the relevant facts bearing on the issue of attorneys' fees and costs and incorporates by reference prior orders setting forth the case's lengthy history. See Order Denying Summ. J. Re: Indemnity, Dkt. # 468 (Sept. 22, 2004); Order Granting Summ. J. Re: Allocation, Dkt. # 499 (Dec. 1, 2004); Order Granting Mot. for J., Dkt. # 604 (June 20, 2005).

In the late 1990s, Philips' electronic toothbrush competitor, Gillette, filed two lawsuits against it, alleging that Philips had engaged in false and misleading advertising of the Sonicare® toothbrush. Philips, in turn, tendered a claim to its insurance company, Federal, demanding a defense. Federal denied coverage and disavowed its duty to defend, thereby forcing Philips to file suit in this court seeking declaratory and injunctive relief as well as reimbursement for litigation fees and costs. The parties resolved the coverage issue as to the first Gillette lawsuit ("G-1"), but continued to dispute Federal's coverage and duty to defend as to the second ("G-2"). By fall 2001, Philips informed Federal that the cost of defending the G-2 action would reach an estimated $7 million by year's end and another $7.8 to try the case. In December 2001, Philips settled G-2 for $5.5 million.

After several summary judgment motions and rulings on the issue of Federal's duty to indemnify, including an appeal to the Ninth Circuit, this court awarded Philips the full value of the G-2 settlement plus interest (Dkt. ## 604, 605). Philips now moves the court for an award of litigation fees and costs in the amount of $4,601,245.44 that it claims it has incurred as a result of being forced to litigate against Federal to recoup the benefit of its insurance contract. Federal moves for an evidentiary hearing under Fed. R. Civ. P. 54(d) to establish facts regarding the reasonableness of Philips' request for attorneys' fees and costs.

ORDER – 2

### III.   DISCUSSION

**A.   Given the Extensive Record Before the Court, An Evidentiary Hearing is Unnecessary.**

Federal moves for an evidentiary hearing under Fed. R. Civ. P. 54(d)(2) and 43(e). Federal contends that live testimony from experts is required to resolve supposed factual disputes. The court is not persuaded that live testimony from the parties' experts will provide clarification beyond the several hundred pages of record currently before it. Henry v. Gill Industries, Inc., 983 F.2d 943, 946 (9th Cir. 1993) (where the record and supporting affidavits are sufficiently detailed, the court need not hold an evidentiary hearing).

**B.   Washington Law Entitles Philips to Recover Attorneys' Fees for Litigating Issues of Allocation and Estoppel.**

Sitting in diversity, the court applies Washington law to a motion for attorneys' fees that follows an insurance coverage dispute. Nordstrom, Inc. v. Chubb & Son, Inc., 54 F.3d 1424, 1429, 1437 (9th Cir. 1995). The parties do not dispute that Philips is entitled to attorneys' fees and costs under Olympic Steamship Company v. Centennial Ins. Co. ("OSS"), 811 P.2d 673, 681 (Wash. 1991) (holding that an insured is entitled to recover attorney fees when it is forced to bring a lawsuit in order to obtain the benefit of its bargain with an insurer). Federal, however, contends that only certain of Philips' fees[1] fall within the OSS doctrine and that the remaining fees are not recoverable. Specifically, Federal calls out three categories of litigated issues for which it claims Philips cannot recover: "allocation," "estoppel," and "counterclaim valuation."

At the outset, the court acknowledges that the primary purpose behind an award of attorneys' fees under OSS is "to ma[ke] the insured whole." Panorama Vill. Condo.

---

[1] The court refers generally to the term "fees" to encompass both reasonable attorneys' fees and costs. The parties do not dispute that OSS encompasses both types of expenditures.

ORDER – 3

Owners Ass'n Bd. of Dirs. v. Allstate Ins. Co., 26 P.3d 910, 917 (Wash. 2001). Despite several challenges to the doctrine, Washington courts continue to uphold the equitable remedy based, in part, on the rationale that an insurer owes an enhanced fiduciary obligation to the insured. McGreevy v. Oregon Mut. Ins. Co., 904 P.2d 731, 738 (1995) (citing Tank v. State Farm Fire & Casualty Co., 715 P.2d 1133, 1135 (Wash.1986). An award of attorneys' fees under OSS attempts to remedy the inequity that occurs "when an insurer unsuccessfully contests coverage [and] place[s] its interests above the insured." McGreevy, 904 P.2d at 738.

In considering a request for OSS attorneys' fees, the court must distinguish between fees incurred by the insured in litigating the issue of *coverage* (for which fees are recoverable) versus those incurred solely as a result of litigating the *value* of a particular claim (for which fees are not recoverable). Compare Leingang v. Pierce Co. Med. Bureau, Inc., 930 P.2d 288, 295 (Wash. 1997) (OSS fees recoverable following insured's successful litigation of coverage dispute) and Dayton v. Farmers Ins. Group, 876 P.2d 896, 898 (Wash. 1994) (OSS fees not available where insurer admitted coverage but contested the value of the claim in arbitration).

A genuine "valuation" dispute occurs, as in Dayton v. Farmers, where the insurer readily admits coverage from the outset, but in good faith denies the value of the claim. 876 P.2d at 898. In Dayton, the Washington Supreme Court reasoned that, after being struck by an uninsured motorist ("UIM"), Plaintiff Dayton received the benefit of his bargain when Defendant Farmers paid for his medical bills and submitted to UIM arbitration, as provided for in the policy. Id. at 897-8. The purpose behind the UIM statute, the court noted, was to place Farmers in the shoes of the uninsured tortfeasor, thereby putting Dayton in the position that he would have been had he collided with an insured tortfeasor. Given that an insured tortfeasor would not be liable for attorneys' fees, the Dayton court reasoned that awarding attorney fees in a UIM arbitration to

ORDER – 4

determine damages would, in fact, "give the insured *more* than he or she contracted for." Id. at 898. As such, the court distinguished between the provision of fees under OSS and the "entirely different set of circumstances" where Dayton both received his contractual benefit and where any additional award in the form of attorneys' fees would place him in a better position than that provided by his policy. Id.

If an insurer admits some coverage, but disputes the full extent of its obligation, OSS, rather than Dayton, governs. Leingang, 930 P.2d at 295; McGreevy v. Oregon Mut. Ins. Co., 904 P.2d 731, 738 (1995). In McGreevy v. Oregon Mut. Ins. Co., for example, the Washington Supreme Court held that the widow of a deceased driver was entitled to OSS attorneys' fees after the insurer took the position that it owed for just one covered event, which compelled the insured to litigate the issue of "stacking" her UIM benefits assigned to four insured vehicles. Id.

Not surprisingly, insurers have attempted to take shelter under Dayton's protective cloak in order to avoid OSS fees. Leingang, 930 P.2d at 294-5. For example, in Leingang v. Pierce Co. Med. Bureau, Inc., the Washington Supreme Court rejected an attempt by the insurer to recast a coverage dispute as a mere valuation disagreement; the court, instead, looked through to the parties' "real dispute" surrounding coverage. Id. Determining whether the "real" dispute is more appropriately termed coverage or valuation, however, is not always an easy task. Solnicka v. Safeco Ins. Co., 969 P.2d 124, 126 (Wash. Ct. App. 1999) (recognizing the "fine line" between a Dayton valuation dispute and an OSS coverage dispute). Division Three of the Washington Court of Appeals offers the following distinction:

> Coverage questions focus on such questions as whether there is a contractual duty to pay, who is insured, the type of risk insured against, or whether an insurance contract exists at all. Claim [or, valuation] disputes, on the other hand, raise factual questions about the extent of the insured's damages. They involve factual questions of liability, injuries, and damages . . . .

ORDER – 5

Solnicka, 969 P.2d at 126.

Distinguishing between coverage and valuation presents a close question where, for example, the parties focus heavily on the amount of available damages. Godfrey v. Hartford Casualty Ins. Co., 16 P.3d 617, 624 (2001) (discussing McGreevy, 904 P.2d at 32-3). In Godfrey v. Hartford Casualty Ins. Co., the court awarded attorneys' fees to an insured couple, the Godfreys, where the insurance company opposed entry of the arbitration award as judgment, and claimed the right under the policy to a trial de novo. Although the dispute also presented questions concerning the value of the claim, the court held that the case was "more akin to a dispute over the vindication of policy provisions" because the Godfreys did not receive the benefit of their bargain when they were forced to litigate the entry of the arbitral award in their favor. 16 P.3d at 624. Accordingly, the court held that OSS entitled the couple to attorneys' fees. Id.

### 1.     The Allocation Dispute

Federal argues that OSS does not apply to Philips' fees incurred as a result of litigating the allocation issue.[2] Philips' efforts to prove the value of covered advertisements in relation to the value of the settlement as a whole, Federal contends, was wholly unnecessary to prove that Federal owed coverage in the first place. As such, Federal contends that the litigation relating to allocation should be construed as a Dayton valuation dispute. Federal proposes a corresponding reduction of attorneys' fees in the amount of $301,863.65, or 899 hours and $46,703.59 for expert witness fees.

---

[2]Following settlement of G-2, the parties spent substantial time litigating the issue of allocation - i.e., whether the court would require Philips to allocate its settlement damages between covered and uncovered losses, which could, in turn, reduce or eliminate the indemnity claim against Federal. Following extensive briefing and oral argument, this court held that there was no reasonable basis for separating out the losses given that, among other factors, the settled claims arose from the "same factual core" and the agreement itself did not assign damages on an advertisement-by-advertisement basis or with any other particularity (Dkt. # 499).

ORDER – 6

The court holds that the parties' litigation over the issue of allocation is best characterized as a dispute over the "extent of the benefit provided by [the] insurance contract," which falls under the rubric of coverage, not valuation. McGreevy, 904 P.2d at 738. As with the insurer's position in the McGreevy "stacking" dispute, Federal continued to dispute the *extent* of its obligation ("if any") in response to Philips' motion for summary judgment on allocation. Federal's Resp. Re: Allocation at 13 (proposing a methodology by which Philips would be required to establish coverage as to each of its ads about which Gillette complained).[3]

Federal argues that this court's decision on allocation was entirely unnecessary to the issue of proving coverage. Federal is correct, but only insofar as the court's decision did not require it to determine whether Federal owed coverage for particular ads among the claims settled with Gillette; the court, rather, determined that all losses arose from the same factual core (Dkt. # 499). Federal seems to imply that once the Ninth Circuit forced it to concede coverage as a matter of law, the coverage dispute was over. The court finds it is more accurate to say that, similar to reducing an arbitration award to judgment in Godfrey, resolving the allocation dispute was inseparable from and a necessary prerequisite to Philips' motion for judgment against Federal. The fact that Federal continued to dispute the extent of coverage following the Ninth Circuit remand is akin to litigation over the "stacking" of benefits at issue in McGreevy. Although it is true that the allocation dispute involved damages – perhaps, overwhelmingly so, in the hearts and minds of the parties – the "fundamental issue" remained the scope and extent of coverage. McGreevy, 904 P.2d at 738; Godfrey, 16 P.3d at 624. Further, in coming to its

---

[3] Federal's brief contains further examples of its continued dispute regarding coverage: "Federal believed (and still believes) that any settlement by Philips was settlement of uncovered claims." Def.'s Resp. Brief Re: Allocation at 23; "Philips wants to shortcut the process by trying to get this court to make Federal pay for the entire settlement, even if only a tiny percentage of claims (or *no* claim) turns out to be covered." Id. at 24 (emphasis original).

ORDER – 7

conclusion, the court takes into account the equitable purpose behind OSS to make Philips "whole" after it was compelled to file suit to vindicate its insurance policies. Panorama, 26 P.3d at 910. Against this backdrop, the court holds that Philips is entitled to reasonable attorneys' fees under OSS for its litigation of the allocation issue.

### 2. Estoppel

Similar to its argument on allocation, Federal argues that the estoppel issue[4] did not have any bearing on proving coverage. Federal requests a reduction in fees in the amount of $35,000 for Philips' defense of Federal's motion regarding estoppel. Philips claims that the estoppel argument remained central to the coverage dispute given that, if Federal's motion had been granted, the effect would have "rendered nugatory" the portion of policies later determined by the Ninth Circuit to contain Federal's duty to indemnify.

The court holds that litigation surrounding estoppel is best characterized as part and parcel of the coverage dispute. Judge Rothstein, the respected district judge who formerly presided over this lawsuit, resolved several motions concurrent with those addressing the estoppel issue (Dkt. # 358).[5] Most important to the instant matter, Judge Rothstein held that Philips had established a prima facie case of coverage by identifying 233 ads for which it claimed Federal owed coverage. The court went on to conclude that "[i]n light of the court's findings that Philips has established a prima facie case of

---

[4] The estoppel issue concerned Federal's unsuccessful attempt to limit the scope of indemnifiable advertising contained in the G-2 settlement agreement by arguing that Philips should be estopped from making arguments allegedly contrary to those it made in the course of defending the underlying G-2 lawsuit (Dkt. ### 289, 290, 358).

[5] The order resolving the estoppel issue eventually became moot when Judge Rothstein granted summary judgment in Federal's favor on the issue of indemnity (# 392), thereby triggering Philips' Ninth Circuit appeal. The fact that Federal did not again raise estoppel does not alter the court's decision regarding whether the dispute involved coverage. Notably, the arguments surrounding the estoppel issue eventually resurfaced in the parties' dispute over allocation. Philips' Sum. J. Mot. Re: Allocation at 6, 11.

coverage, Federal's estoppel arguments are moot." The court is persuaded that Philips' efforts to make out a prima facie case for coverage by defending the "universe of ads" for which Federal owed coverage was a necessary component in its battle for coverage and thus falls under <u>OSS</u>. Consequently, the court holds that Philips is entitled to attorneys' fees for its work defending Federal's estoppel motion.

### 3. Counterclaim Valuation

Finally, Federal argues that Philips' fee request for time spent on "counterclaim valuation"[6] falls under the <u>Dayton</u> exception to <u>OSS</u> attorneys' fees. Federal cites a dozen of Philips' billing entries that reference counterclaim valuation for an approximate total of $13,795.00. Neal Decl. ¶ 15. In its opening brief, Philips indicates that its released counterclaim against Gillette "was not an issue and was not litigated" against Federal. Philips' Mot. Re: Atty Fees at 2. In doing so, Philips appears to concede that it cannot recover fees for such work or, at a minimum, did not intend to seek reimbursement for such fees. Indeed, in its reply, Philips does not attempt to justify or reduce its request regarding any of the dozen entries that Federal cites as reflecting counterclaim valuation work. Accordingly, the court deducts $13,795.00 from Philips' request.[7]

**C.  The Court Awards Philips Reasonable Attorneys' Fees in the Amount of $3,911,058.44.**

Although the equitable remedy provided by <u>OSS</u> strives to make the insured whole, the request for attorneys' fees must still be reasonable, as calculated under the "lodestar"

---

[6] According to Federal, the counterclaim valuation issue involves fees incurred as a result of Philips' attempt to recover from Federal some undefined value for the release of its counterclaim against Gillette in the underlying G-2 suit – beyond the $5.5 million.

[7] Although some entries contain work related to both counterclaim valuation and allocation, the court does not attempt to further segment the time entries given that it was Philips' burden to do so.

ORDER – 9

method.[8] McGreevy, 951 P.2d 798, 802-05 (Wash. Ct. App. 1998) (on remand, the court considered the lodestar method as the accepted starting point in a request for OSS attorneys' fees), rev'd on other grounds by Panorama, 26 P.3d at 917 (2001); see also, Olivine Corp. v. United Capitol Ins. Co., 19 P.3d 1089 (Wash. Ct. App. 2001) (upholding upward adjustment of lodestar amount in OSS case), rev'd on other grounds by 52 P.3d 494 (2002). Under the lodestar method, the court must multiply the number of hours Philips' counsel reasonably expended in pursuing its claims by a reasonable hourly rate. Bowers v. Transamerica Title Ins. Co., 675 P.2d 193, 202 (Wash. 1987). The court cannot award attorneys' fees for "hours spent on unsuccessful claims, duplicated effort, or otherwise unproductive time." Id. at 203. The party seeking fees bears the burden of proving the reasonableness of its fee request. Mahler v. Szucs, 957 P.2d 632, 650 (Wash. 1998). The court has broad discretion in determining attorneys' fees, subject to review only for "manifest abuse." Boeing Co. v. Sierracin Corp., 738 P.2d 665, 682 (Wash. 1987).

**1.   Reasonableness of Hours Expended**

The court considers first whether Perkins Coie, LLP ("Perkins") expended a reasonable number of hours in securing a successful recovery for Philips. Federal argues that Perkins' time spent is unreasonable on several grounds.

---

[8] Throughout its briefing, Philips states or implies that, because OSS requires that the insured be "made whole," the court should read leading Washington cases on attorneys' fees with caution. See, e.g., Philips Reply Re: Atty Fees at 2; Hale Reply Decl. ¶¶ 41, 49 (urging the court to distinguish the "non-OSS" case of Absher, discussed infra). As stated previously, OSS dictates this court's determination regarding the types of disputes for which Philips is entitled to recover fees (i.e. valuation versus coverage); the court declines, however, to abandon or otherwise limit Washington caselaw that guides this court on burden of proof, calculation methodology and the like.

ORDER – 10

a.      **Detail of Attorney Billing Entries**

At the outset, Federal argues that the billing entries, "peppered throughout" Perkins' invoices, lack sufficient detail from which to determine whether the time spent was unnecessary, duplicative or otherwise unproductive. Federal's Resp. at 7 (citing Talmadge Decl. ¶ 8). Federal claims that Philips fails to meet its burden in substantiating the reasonableness of its fee request where it submits attorney billing entries that read, for example, "case management," "draft additional to-do list," and "review trial strategy issues." Such vagueness, Federal contends, warrants a reduction totaling $121,000. Malamud Decl. p. 84-95 (listing billing entry by category of billing entry).

The court finds that Philips' motion is sufficiently detailed as to attorney billing entries. The provided documentation "need not be exhaustive or in minute detail, but must inform the court, in addition to the number of hours worked, of the type of work performed and the category of attorney who performed the work (i.e. senior partner, associate, etc.)." Bowers, 675 P.2d at 203. Here, although billing entries of "case management" do not reflect model practice, the court does not find that such detail falls below the Bowers legal standard. Moreover, Philips provides detail beyond Perkins' invoices; Philips also submits a month-by-month narrative of case activities, Hale Decl. ¶¶ 65-105, as well as detailed responses to Federal's interrogatories, Hale Reply Decl. at p. 22-212.

b.      **Detail of Non-lawyer Billing Entries and Fees for Administrative Tasks**

Federal also contends that Philips has provided insufficient detail from which the court can determine whether the hours incurred by non-lawyer staff reflect work that is legal or clerical in nature. Federal contends that the court should reduce the award in the amount of $382,600 for paralegal document handling and $32,794 for paralegal work in deposition preparation. Talmadge Decl. ¶ 10; Malamud Decl. p 241-47; 249-326.

ORDER – 11

Beyond allegedly vague entries by non-lawyer staff, Federal argues that an additional 2,400 hours worth of billing entries (regardless of the category of personnel) clearly represent charges for non-recoverable administrative tasks. Federal cites, for example, 350 hours spent "mothballing" a file. Talmadge Decl. ¶ 10. Federal requests a further reduction of $ 256,100, representing a total of $638,700. Philips contends that Washington caselaw on recovering for non-lawyer personnel and administrative tasks is inapplicable in the OSS context.

In order to recover for work performed by non-lawyer personnel, the court adopts the criteria announced in Absher Const. Co. v. Kent Sch. Dist:

> (1) the services performed by the non-lawyer personnel must be legal in nature; (2) the performance of these services must be supervised by an attorney; (3) the qualifications of the person performing the services must be specified in the request for fees in sufficient detail to demonstrate that the person is qualified by virtue of education, training, or work experience to perform substantive legal work; (4) the nature of the services performed must be specified in the request for fees in order to allow the reviewing court to determine that the services performed were legal rather than clerical; (5) as with attorney time, the amount of time expended must be set forth and must be reasonable; and (6) the amount charged must reflect reasonable community standards for charges by that category of personnel.

917 P.2d 1086, 1088 (1996). By this criteria, the court cannot compensate for administrative tasks such as preparing and delivering copies, but may award fees for time spent, for example, preparing briefs or depositions. Id.

Here, Philips' failure to establish at least three of the above criteria prevents the court from awarding their full fee request as it relates to non-lawyer personnel. First, Philips does not provide the qualifications of certain members of its support team to demonstrate that the work performed was substantively legal. Hale Decl. ¶ 31-37 (describing years of experience for only some members of the support team). Second, Philips states that lead paralegal Mary Lou Maag supervised the work of the support staff. Hale Decl. ¶ 32. Although such a reporting structure is probably highly efficient for the

ORDER – 12

Perkins team, the Absher criteria require attorney supervision.[9] Third and most importantly, various entries include work that is likely clerical in nature ("delivery of deposition preparation binders," "assist with copying," "assist with printing of color exhibits," "review copy job on settlement correspondence," etc.). Other entries are more ambiguous ("review correspondence regarding deposition exhibit index," "continue work on witness notebooks," etc.). Still others describe work that is assuredly legal in nature ("research questions and issues for summary judgment motions," "review and work on discovery requests from Federal," etc.). Considered against the Absher criteria and with Philips' burden of proof in mind, the court must make a fee deduction for paralegal time to account for work that Philips has either failed to establish as legal in nature or for entries submitted by staff for whom Philips has failed to substantiate necessary qualifications. Based on the court's review of what it believes is a fair cross-section of billing entries,[10] the court deducts $253,000 from the overall request.

   **c. Duplicated Effort and Unproductive Time**

Federal contends that the court should reduce Philips' award by $120,762 for unnecessary and/or duplicative work[11] and then reduce the remaining total request by 40%

---

[9] The court notes that some of the support staff also designate a supervising attorney for a given project; thus, the court does not automatically subtract fees by all support staff that work under Ms. Maag's supervision. In calculating the number of reasonable hours spent, the court does, however, take into account the proportion of entries that lack such a designation regarding attorney supervision.

[10] The court reviewed sample billing periods from each "Phase" of litigation, as presented by Philips, and then considered such entries in relation to the Absher criteria discussed above. The court then deducted a proportional amount from that listed on the summary chart in Exhibit 9.

[11] Federal lumps together the concepts of unnecessary and duplicative work on the one hand, and duplicative and excessive work on the other. Bowers instructs courts to discount hours spent on "unsuccessful claims, duplicated effort, or otherwise unproductive time." 675 P.2d at 203. The court considers Federal's allegations as falling under the general heading of "otherwise

for allegedly excessive work.  Federal's Resp. Re: Atty Fees at 8 -11, Neal Decl. ¶¶ 20 - 47.  Philips argues that unique circumstances, including Federal's own bad-faith litigation tactics[12] and the complex nature of the case impact its fee request.  Philips' Mot. Re: Atty Fees at 9-12, Hale Decl. ¶¶ 106-113.

Philips has not met its burden with regard to excising unproductive time from its fee request.  On the one hand, Philips has carefully accounted for potential duplicated effort by citing fee credits totaling over $48,000, which Perkins provided to Philips in order to account for extra time accrued in light of lead attorney Stephen Hale's illness.  Hale Supp. Decl. ¶ 55.  Philips also redacted 39 billing entries from its invoices, reflecting $37,065.40.  Hale Supp. Decl. ¶ 2.  Moreover, in its reply to Justice Talmadge's declaration, Philips correctly notes that the hours spent on a particular task, for example, must be placed in context.  Hale Reply Decl. ¶ 37 (discussing importance of time spent on Ninth Circuit brief, which was an "effort to resurrect a multi-million dollar case that had been terminated abruptly").  On the other hand, according to Federal and undisputed by Philips, Perkins attorneys spent a combined 285 hours in interoffice conferences, representing $97,700.  Federal's Resp. Mot Re: Atty Fees at 9.  Perkins attorneys often triple- and quadruple-teamed on drafting, editing and revising particular documents.  Id. at 10.  With Philips' burden of proof in mind, the court cannot conclude that the billing entries representing concurrent work by several Perkins attorneys is reasonable.  The

---

unproductive time" given the substantial overlap in both the concepts and in the inconsistent use of terms in the parties' briefings.

[12] The court is not persuaded by the extensive and venomous cross-allegations of "bad-faith."  Philips cites Public Utility Dist. No. 1 v. Kottsicle ("PUD") for the notion that bad faith constitutes a separate basis on which to recover fees.  545 P. 2d 1, 3-4 (1976).  The court finds PUD inapposite to the instant matter in that the PUD court provided such a remedy in the *absence* of any attorneys' fee statute.  Id.

ORDER – 14

court reviews a fair cross-section of billing entries and deducts an additional $423,428 from Philips' request.

### d. Costs

Federal does not dispute that Philips is entitled to recover costs under OSS; rather, Federal argues that Philips' request attempts to recover "excessive costs." Federal contends that Perkins insufficiently detailed its Westlaw research charges and that Philips' requested costs are unreasonable because Federal's costs were 50% less.

The court holds that Philips is entitled to recover its full request for costs. Panorama, 26 P.3d at 917 ("To make [the insured] whole, 'reasonable attorney fees' must, by necessity, contemplate expenses other than merely the hours billed by an attorney. The insured must therefore be compensated for *all* the expenses necessary to establish coverage . . .") (emphasis in original). The court finds billing entries for research costs sufficiently detailed and finds any comparison to Federal's litigation costs unavailing. The court, therefore, makes no reduction to the overall request as to Philips' costs.

### 2. Reasonableness of Hourly Rate Charged

The court next considers whether the hourly rate charged by Perkins is reasonable. Federal argues emphatically that Perkins attorney and non-lawyer personnel rates are "high," Talmadge Decl. ¶ 7, and therefore not reasonable.

A lawyer's customary rate is generally presumed reasonable. Bowers, 675 P.2d at 203 ("Where the attorneys in question have an established rate for billing clients, that rate will likely be a reasonable rate."). Washington courts may consider factors under the Rules of Professional Conduct in determining the reasonableness of a fee. Mahler, 957 P.2d at 651 n.20 (citing RPC 1.5(a)).[13]

---

[13] RPC 1.5(a) reads: "The lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following: (1) The time and labor required, the novelty and difficulty of the questions involved, the skill requisite to perform the legal service

ORDER – 15

     The court is satisfied that Philips has met its burden in establishing the reasonableness of its hourly billing rates.  At the threshold, the court presumes that the as-agreed upon rate between Perkins and Philips is reasonable.  <u>Bowers</u>, 675 P.2d at 203.  The court also takes into account that Perkins and Optiva Corporation (n/k/a Philips) have enjoyed a business relationship for over fifteen years.  See RPC 1.5(a)(6); Hale Decl. ¶ 3.  Moreover, Philips provides evidence of a local attorney, experienced in the area of complex insurance litigation, who charges a fee slightly higher than lead attorney Mr. Hale and commensurate with that of the blended rate of Perkins' core team.  See RPC 1.5 (a)(3) Parris Decl. ¶ 6; Neal. Decl. at 69 (Parris Dep).  Philips admits that its firm-wide attorneys' rates are on the high end of the fees customarily charged in the Seattle area, but the court is not persuaded by Federal's argument that a comparison to the rates charged by Federal's lawyers at Cozen O'Connor necessitates the need for a reduced hourly rate.  <u>Crest Inc. v. Costco Wholesale Corp.</u>, 115 P.3d 349, 356 (Wash. Ct. App. 2005) (comparison to local fees is just one factor to consider).

     Accordingly, the court finds that Perkins' hourly rate is reasonable and therefore, the lodestar calculation remains unchanged as to the prior deductions reflecting reasonable hours expended.

## IV.   CONCLUSION

     For the reasons stated above, the court DENIES Federal's request for an evidentiary hearing (Dkt. # 642) and GRANTS in part Philips' motion for attorneys' fees

---

properly and the terms of the fee agreement between the lawyer and client; (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) The fee customarily charged in the locality for similar legal services; (4) The amount involved in the matter on which legal services are rendered and the results obtained; (5) The time limitations imposed by the client or by the circumstances; (6) The nature and length of the professional relationship with the client; (7) The experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) Whether the fee [is fixed or contingent]."

ORDER – 16

(Dkt. # 613) in the reduced amount of $3,911,058.44. The court further ORDERS that Philips is entitled to an award of interest from the date of entry of judgment in this matter (June 21, 2005) at the statutory rate of 3.39% until paid.

Dated this 10th day of November, 2005.

s/James L. Robart
_____
JAMES L. ROBART
United States District Judge

ORDER – 17